United States District Court
District of New Jersey

| UNITED STATES OF AMERICA | : | **CRIMINAL COMPLAINT** |
|---|---|---|
| **v.** | : | **Magistrate No. 18-3573** |
| JOYCE MARIE ELIABACHUS, a/k/a | : | |
| "Joyce Marie Gundran Manangan" | : | |

I, Brian T. McCormick, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief.

SEE ATTACHMENT A

I further state that I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations, and that this complaint is based on the following facts:

SEE ATTACHMENT B

continued on the attached page and made a part hereof.

Brian T. McCormick, Special Agent
U.S. Dept. of Homeland Security
Homeland Security Investigations

Sworn to before me and subscribed in my presence,

April 23, 2018                          at      Newark, New Jersey
Date                                              City and State

Honorable Mark Falk
United States Magistrate Judge
Name & Title of Judicial Officer                 Signature of Judicial Officer

1

## ATTACHMENT A

Count One
(Conspiracy to Violate the Iranian Transactions and Sanctions Regulations)

From in or about November 2013 through in or about April 2018, in Morris County, in the District of New Jersey and elsewhere, defendant

JOYCE MARIE ELIABACHUS
a/k/a "Joyce Marie Gundran Manangan"

did knowingly and intentionally conspire and agree with others known and unknown to export, re-export, sell and supply, and attempt to export, re-export, sell and supply, goods, to wit: aircraft components, directly or indirectly from the United States to Iran, without first obtaining the required export control licenses from the Office of Foreign Assets Control, in violation of Title 50, United States Code, Sections 1702 and 1705; and Title 31, Code of Federal Regulations, Sections 560.203, 560.204, 560.205, and 560.208.

Count Two
(Conspiracy to Commit Money Laundering)

From in or about November 2013 through in or about April 2018, in Morris County, in the District of New Jersey and elsewhere, defendant

JOYCE MARIE ELIABACHUS
a/k/a "Joyce Marie Gundran Manangan"

did knowingly and intentionally conspire and agree with others known and unknown to transmit and transfer monetary instruments and funds from a place outside the United States, to wit, Turkey and Iran, to a place in the United States, to wit, New Jersey, with the intent to promote the carrying on of specified unlawful activity, namely the smuggling of aircraft components from the United States contrary to Title 18, United States Code, Section 554(a), and contrary to Title 18, United States Code, Section 1956(a)(2)(A), in violation of Title 18, United States Code, Section 1956(h).

## Count Three
### (Conspiracy to Smuggle Goods from the United States)

From in or about November 2013 through in or about April 2018, in Morris County, in the District of New Jersey and elsewhere, defendant

### JOYCE MARIE ELIABACHUS
a/k/a "Joyce Marie Gundran Manangan"

did knowingly and intentionally conspire and agree with others known and unknown to fraudulently export and send from the United States merchandise, articles, and objects, including aircraft components, contrary to Title 13, United States Code, Section 305, and to receive, conceal, buy, sell and in any manner facilitate the transportation, concealment, or sale of such merchandise, articles and objects, prior to exportation, knowing the same to be intended for exportation, contrary to Title 18, United States Code, Section 554(a).

In furtherance of the conspiracy and to effect its unlawful objects, the above-listed defendant and her co-conspirators committed and caused to be committed the overt acts, among others, in the District of New Jersey and elsewhere, as set forth in Attachment B below, in violation of Title 18, United States Code, Section 371.

3

## ATTACHMENT B

I, Brian T. McCormick, am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI"). I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents, and other pertinent items of evidence. Where statements of others are related herein, they are related in substance and in part. Because this complaint is being submitted for a limited purpose of establishing probable cause to support the issuance of a complaint and arrest warrant, I have not necessarily included each and every fact that I know or that other law enforcement agents know concerning this investigation. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the day alleged.

### The Defendant and Co-Conspirators

1.      Joyce Marie Eliabachus a/k/a "Joyce Marie Gundran Manangan" ("Eliabachus") is a naturalized U.S. citizen and a resident of Morristown, New Jersey.   Eliabachus serves as the principal officer and operator of a privately held, New Jersey business entity known as Edsun Equipments LLC, a/k/a Edsun Equipment LTD ("Edsun Equipments"), a purported aviation equipment parts trading company.   Edsun Equipment's headquarters is co-located at Eliabachus' personal residence ("the New Jersey Address"), which has no commercial or manufacturing facilities or capabilities.

2.      A co-conspirator ("CC-1") is a citizen and resident of Iran.   CC-1 is the operations and sales manager, and is otherwise affiliated with, purported foreign aviation supply and engineering companies including, among others: (a) an entity referred to herein as "Business #1," located in Tehran, Iran, and Istanbul, Turkey; (b) Blue Clouds Aviation, located in Tehran, Iran; (c) Sun Bright Havacilik Ic Ve Dis Tic, also known as Sun Bright Aviation, located in Tehran, Iran; (d) Pelikano Gida Ic Ve Dis Ticaret, located in Istanbul, Turkey; and (e) Tango Ic Ve Dis Tic LTD, located in Istanbul, Turkey (collectively, the "Iranian Network").

### Summary of Investigation

3.      A joint investigation conducted by HSI and the U.S. Department of Commerce ("DOC") has revealed that defendant Eliabachus and CC-1, together with others known and unknown (collectively, the "defendants"), are part of an

4

illicit, international procurement network that is designed to surreptitiously acquire large quantities of aircraft components from United States manufacturers and vendors, and to unlawfully export those parts to entities in Iran.   Over approximately the last four years, this network has obtained and exported over $2 million worth of aircraft components from the United States to Iranian business entities in violation of export control laws, as further described herein.

4.     Law enforcement officials have determined that the defendants' Iranian-based conspirators were responsible for obtaining initial requests for quotes ("RFQs") for U.S.-manufactured aircraft components from various Iranian entities.   Several of those entities included Iranian airline companies officially designated by the U.S. government as posing a threat to this country's national security, foreign policy, or economic interests.   The foreign RFQs were then submitted by the defendants electronically through an online aircraft parts database located in the U.S.   The RFQ's were intended to solicit bids from various U.S.-based manufacturers and distributors for the requested aircraft components.   The defendants established and used an access account affiliated with its New Jersey entity, Edsun Equipments, to submit the RFQs in order to conceal the foreign nexus of each request.   Using Edsun Equipments, the defendants finalized the purchase and acquisition of the requested components from the various U.S.-based companies, and in each instance concealed the true identity of the ultimate end-user[1] of the aircraft components in Iran.

5.     Upon receipt of the components at the New Jersey Address, defendant Eliabachus prepared the parts for export using various U.S.-based shipping companies.   In each instance, the defendants systematically concealed the true destination of the parts they were exporting by directing that the shipments be sent to various freight-forwarding companies located in the United Arab Emirates ("UAE") and Turkey.   On several occasions, defendant Eliabachus falsely diminished the true value of the exported items on shipping documents in order to evade the legal requirement of filing an Electronic Export Information ("EEI") via the Automated Export System ("AES"),[2] thereby further

---

[1] The DOC requires that certain forms (*i.e.*, 'end-user agreements') be properly executed in connection with the export of license-controlled items.   The DOC requires that a completed form BIS-711 ("Statement by Ultimate Consignee and Purchaser") be included as part of an application for authorization to export certain controlled items, subject to the parameters of 15 C.F.R. §§ 748, et. seq.

[2] Criminal penalties for unlawful export information activities as they pertain to EEI's (formerly known as Shipper's Export Declaration ("SED") forms) are prescribed by 13 U.S.C. § 305.   Generally, a DOC Form 7525-V (referred to herein as an "SED Form") is required for all shipments sent to foreign countries regardless of the method of transportation, subject to certain restrictions.   As it applies to the instant

concealing the network's unlawful export activities from law enforcement authorities.   In other instances, defendant Eliabachus falsified the value, destination, and/or end-user of the exported aircraft components, thereby deceiving customs officials of the true nature of the shipment.   Upon arrival of the parts at the UAE and Turkish-based freight forwarders, defendant CC-1 arranged for trans-shipment of the items through the Iranian Network to various locations and end-users in Iran.   The defendants failed to obtain a single export license for any of the aircraft components purchased or exported during the relevant timeframe of this investigation.

6.     As further detailed herein, the funds for the defendants' illicit transactions were obtained from overseas sources through international wire transfers.   Through numerous Turkish-based bank accounts held in the name of companies comprising the Iranian Network, CC-1 directed millions of dollars into the defendants' U.S.-based accounts.   The defendants' creation and use of foreign front, or "shell," companies and bank accounts was intended to conceal the true sources of funds in Iran, as well as the identities of the various Iranian corporations who were receiving U.S. aircraft components.

Summary of Relevant Export Regulations

A.     The International Emergency Economic Powers Act

7.     Under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701, et seq., the President of the United States was granted the authority to deal with unusual and extraordinary threats to the national security, foreign policy, and economy of the United States.   Under IEEPA, the President could declare a national emergency through Executive Orders that had the full force and effect of law.

8.     On August 17, 2001, under the authority of IEEPA, the President issued Executive Order 13222, which declared a national emergency with respect to the unrestricted access of foreign parties to United States goods and technologies and extended the Export Administration Regulations (the "EAR"), 15 C.F.R. §§ 730-774.   Through the EAR, the DOC imposed license or other requirements before an item subject to the EAR could be lawfully exported from the United States or lawfully re-exported from another country.   These items were included on the commerce control list, or "CCL," published at 15 C.F.R. § 774, Supp. 1.   Items on the CCL were categorized by an Export Control

---

investigation, SED forms must be filed when: (i) an item requires an export license; (ii) is bound for an embargoed country; or (iii) the value of the item(s) is greater than $2,500 (U.S.).   SED forms are electronically filed with the DOC through the Automated Export System ("AES").

Classification Number ("ECCN"), which denoted the applicable export controls. The President issued annual Executive Notices extending the national emergency declared in Executive Order 13222 from the time period covered by that Executive Order through the time of this Information.   See, 77 Fed. Reg. 49,699 (Aug. 15, 2012).

9.     Pursuant to its authority derived from IEEPA, the DOC reviews and controls the export of certain goods and technology from the U.S. to foreign countries.   In particular, the DOC places restrictions on the export of goods and technology that it determines could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States. Under IEEPA and the EAR, it is a crime to willfully export, or attempt or conspire to export from the United States, any item listed on the CCL for which a license is required without first obtaining the license from the DOC.   See, 50 U.S.C. § 1705(c); 15 C.F.R. § 764.2.

10.    The DOC's Bureau of Industry and Security ("BIS") contains a list of certain foreign persons – including businesses, research institutions, government and private organizations, individuals and other types of legal persons – that are subject to specific license requirements for the export, re-export, and/or transfer (in-country) of specified items.   These persons comprised the Entity List, as enumerated in 15 C.F.R. § 744, Supp. 4.   The Entity List specifies the license requirements that it imposes on each listed person which are independent of, and in addition to, license requirements imposed elsewhere in the EAR.   15 C.F.R. § 744.1(c) of the EAR prohibits the use of license exceptions for almost all exports and re-exports to listed entities. The Entity List is generally comprised of entities who have engaged in activities that could result in an increased risk of the diversion of exported, re-exported, and transferred (in-country) items to weapons of mass destruction programs. Grounds for inclusion on the Entity List also include entities whose activities have been deemed contrary to the national security and/or foreign policy interests of the United States (entities enumerated on the Entity List are referred to herein as a "banned entity").

B.    <u>The Iran Trade Embargo and the Iranian Transactions Regulations</u>

11.    On March 15, 1995, the President issued Executive Order No. 12957, finding that "'the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and declaring "a national emergency to deal with that threat."[3]

---

[3] Executive Order No. I2957, as expanded and continued by Executive Orders Nos.

12.     Executive Orders Nos. 12959 and 13059 (collectively, with Executive Order No. 12957, the "Executive Orders") imposed economic sanctions, including a trade embargo, on Iran. The Executive Orders prohibited, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person. The Executive Orders also prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in the Executive Orders.

13.     The Executive Orders authorized the United States Secretary of the Treasury, in consultation with the United States Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the Executive Orders.   Pursuant to this authority, the Secretary of the Treasury, through the Office of Foreign Assets Control ("OFAC"), promulgated the Iranian Transactions Regulations ("ITR"), 31 C.F.R. Part 560, implementing the sanctions required by the Executive Orders.[4]

14.     Specifically, absent permission from OFAC in the form of a license, the ITR prohibited, among other things:

    a.     The exportation, re-exportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran, including the exportation, re-exportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that such goods, technology, or services are intended specifically for supply, trans¬ shipment, or re-exportation, directly or indirectly, to Iran or the Government of Iran (31 C.F.R. § 560.204);

    b.     The re-exportation from a third country, directly or indirectly, by a person other than a United States person, of any goods, technology, or services that have been exported from the United States, if: (a) such re-exportation is undertaken with knowledge or reason to know that the re-

---

12959 and 13059, was in effect at all times relevant to this Investigation (*i.e.*, in or about September 2016 through October 2017).

[4] On October 22, 2012, OFAC renamed the "Iranian Transactions Regulations" as the "Iranian Transactions and Sanctions Regulations" ("ITSR") and reissued them in their entirety. The conduct described in this affidavit was unlawful both under the ITR and the renamed ITSR.

exportation is intended specifically for Iran or the Government of Iran, and (b) the exportation of such goods, technology, or services, was subject to export license application requirements under any United States regulations (31 C.F.R. § 560.205); and

c.      Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in the ITR (31 C.F.R. § 560.203).

15.    OFAC also administers and enforces economic and trade sanctions based on U.S. foreign policy and national security goals against targeted foreign countries and regimes, terrorists, international narcotics traffickers, those engaged in activities related to the proliferation of weapons of mass destruction, and other threats to the national security, foreign policy or economy of the United States.   As part of its enforcement efforts, OFAC publishes a list of individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries.   It also lists individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country-specific.   Collectively, such individuals and companies are called "Specially Designated Nationals" or "SDNs."   Their assets are blocked and U.S. persons are generally prohibited from dealing with them. *See, e.g.*, 31 C.F.R. Part 594 (Global Terrorism Sanctions Regulations).[5]

## The Defendants' Criminal Activities

16.    In or about 2014, as part of this scheme, Edsun Equipments was incorporated in New Jersey.   Eliabachus was listed as the company's principal and chief executive.   Eliabachus subsequently opened at least two business bank accounts in the name of Edsun Equipments at a U.S. bank with branches in New Jersey (the "Edsun Accounts").   Eliabachus is the only signatory for the Edsun Accounts.

17.    In or about July 2014, Eliabachus obtained a paid membership to a U.S.-based online aviation parts marketplace (the "Marketplace"). The Marketplace allows members to post RFQs, parts listings, and to make purchases of various aircraft components.   Account opening documents provided by the Marketplace confirm that Eliabachus listed Edsun Equipments as the defendants' primary business entity, and listed the New Jersey Address as the defendants' primary place of business.   Eliabachus also registered an

---

[5] The Executive Orders and the Iranian Transactions Regulations and the Global Terrorism Sanctions Regulations were in effect at all times relevant to this investigation.

account name (the "Edsun ID") which was used to gain online access to the Marketplace.   From in or about February 2015 through in or about February 2018, account records indicate that the Edsun ID was used to access the Marketplace approximately 743 times.   Internet protocol ("IP") address information further indicates that the Edsun ID was used from locations in or around the New Jersey Address, as well as in or around Tehran, Iran, including multiple occasions when the Edsun ID was used from areas in New Jersey and Iran on the same day.   This is an indication to law enforcement that the Edsun ID was likely used by both Eliabachus and CC-1 in connection with the defendants' criminal activities.[6]

18.     Additional documents seized by law enforcement personnel pursuant to a court-authorized search warrant for an e-mail account used by CC-1 (the "CC-1 E-Mail Account") included a computer-generated spreadsheet (the "Spreadsheet").   The Spreadsheet contained thousands of entries evidencing the defendants' activities from in or about July 2014 through in or about October 2015.   In addition to detailed purchase, shipping, accounting, and wire transfer records, the Spreadsheet contained RFQs from the defendants' various Iranian-based customers.   A review of the defendants' customer list (as well as other records obtained in this investigation) confirms that the network has actively pursued the procurement of aircraft components on behalf of several Iranian-based airlines, banned entities, and OFAC-designated SDN's, including the following (among others):

   (a)   Mahan Air Co.: an Iranian-based airline that was placed on the BIS entity list in March 2008, and was subsequently designated by OFAC as

---

[6] Documents obtained from internet service providers and court-authorized search warrants further confirm that Eliabachus and CC-1 utilized various e-mail accounts to correspond with one another and with others in connection with the defendants' criminal activities.   For example, records confirm that an e-mail account (the "Edsun E-Mail Account") subscribed to in the name of Edsun Equipment was created on or about November 27, 2013.   The content of communications from that account indicates that it is primarily used to coordinate purchases of aircraft components from U.S. manufacturers and vendors, as well as to facilitate shipments of those purchases to overseas locations.   The IP address used to establish the account resolves to a location in New Jersey, where Eliabachus resides.   Additionally, the records confirm that the Edsun E-Mail Account has been used thousands of times in the past three years and remains active.   Notably, a review of those log-ins has revealed access to the account through IP addresses resolving to locations in both New Jersey and Iran, including on the same day.   Further, based on a review of law enforcement and open source databases, law enforcement has confirmed that Eliabachus was present in the United States when the Edsun E-Mail Account was accessed in Iran.   This is an indication to law enforcement that the Edsun E-Mail Account is likely used by both Eliabachus and CC-1 in connection with the defendants' ongoing illegal activities.

a SDN in October 2011 for providing financial, material, and technological support to the Islamic Revolutionary Guard Corps - Qods Force (IRGC-QF);

(b)   Ukrainian-Mediterranean Airlines: an airline with headquarters in Iran and Syria, among other locations, that was placed on the BIS entity list in August 2011, and was subsequently designated by OFAC as a SDN in May 2013;

(c)   Caspian Airlines: an Iranian-based airline that was designated by OFAC as a SDN in August 2014;

(d)   Kish Air: an Iranian-based airline that was placed on the BIS entity list in August 2011;

(e)   Atrak Air: a commercial airline headquartered in Tehran, Iran;

(f)   Iran Air Tours: a commercial airline and subsidiary of Iran Air, headquartered in Tehran, Iran;

(g)   ATA Airlines: a commercial airline headquartered in Tabriz, Iran; and

(h)   Karun Airlines: a commercial charter airline with headquarters in Ahwaz, Iran and Tehran, Iran.

19.   Banking records and other lawfully obtained communications further reveal that CC-1 has direct access and/or control of multiple foreign bank accounts held in the name of various Iranian Network companies.   For example, from in or about January 2014 through in or about December 2016, wire transfer information has confirmed that Edsun Equipments received at least ten overseas wire transfers totaling approximately $215,000 from a company identified as "Pelikano Gida Ic Ve Dis Ticaret" ("Pelikano").   A review of law enforcement and open source databases indicates that Pelikano is a purported wholesale trading, transportation, and freight-forwarding company located in Turkey, and is used by the defendants as a front company in connection with their unlawful export operation.[7]

20.   Additionally, on or about January 10, 2013, seized electronic communications reveal that CC-1 initiated the use of a business bank account in the name of "Tango Ic Ve Dis Tic LTD" ("Tango"), a purported commercial

---

[7] On or about November 11, 2016, CC-1 registered the domain name "pelikanoaviation.com" on a business-related website based in the U.S.   The information provided for the registration included the CC-1 E-Mail Account as the entity's primary e-mail contact.   The registration also included the name of an individual identified as "Gokben Yolcu."   A review of records lawfully obtained from an internet service provider revealed frequent and continual contact between the CC-1 E-Mail Account and a purported Pelikano representative utilizing an e-mail address registered to an individual identified as "Gokben CC-1,"   This information is an indication to law enforcement that Pelikano is an entity closely affiliated with - and likely controlled by – CC-1, and has been used in furtherance of the defendants' illicit procurement activities.

aircraft leasing, sales, and parts supply company located in Turkey. Subsequently, CC-1 used the CC-1 E-Mail Account to notify foreign customers, including Iranian-based Karun Airlines (formerly known as Naft Airlines), of the existence of the bank account. Law enforcement has assessed that Tango is another front company used by the defendants to conduct operations. Notably, over the last four years, banking records reveal that Edsun Equipments has received at least 29 wire transfers totaling approximately $1,200,000 from a Turkish bank account held in Tango's name.

21.    In total, law enforcement has determined that from in or about January 2014 through in or about January 2018, approximately $5,140,000 in wire transfers passed between the defendants' foreign bank accounts and the Edsun Accounts.   Upon receipt of the wire transfers to the defendants' U.S.-based accounts, banking and other records show that the defendants routinely made purchases of U.S.-based aircraft components for subsequent export to Iran.   Specifically, from in or about May 2015 through in or about October 2017, the defendants facilitated at least 49 shipments containing a total of approximately 23,554 license-controlled aircraft parts from the U.S. to Iran. Significantly, a review of relevant law enforcement databases has confirmed that no export licenses were applied for by, nor granted to, the defendants or their related entities for any of the shipments identified during this timeframe.

22.    Specific examples of the defendants' illegal export activities are detailed in Sections A through C, below.

        A.    The Brake Assembly Transaction

                i.    On or about January 7, 2015, the Edsun ID was used to submit a RFQ on the Marketplace to an aviation supply company located in Tucson, Arizona ("AAS").   The listing was sent on behalf of Edsun Equipments and Eliabachus, and requested a quote for "Part No. 2608892-1, Brake Assy-MLG V55284, For MD80 ACFT, Quantity 4" (the "Brake Assembly Parts").   An AAS representative subsequently contacted Eliabachus via the Edsun E-Mail Account to advise that his company had one of the four requested Brake Assembly Parts available for sale, at a cost of $9,900.

                ii.    On or about April 27, 2015, CC-1 used the CC-1 E-Mail Account to direct a wire transfer in the amount of $58,000 from a foreign bank account to the Edsun Accounts.   The Edsun Accounts received the wire transfer on May 1, 2015.   Subsequently, on May 5, 2015, CC-1 used the CC-1 E-Mail Account to contact a Turkish freight-forwarding company identified as "Reibel Tasimacilik Ve Tic A.S." ("Reibel"), to advise the company that it would soon be receiving a shipment from the United States.   Upon receipt of that shipment in Turkey, CC-1 advised Reibel representatives that he wanted it

12

forwarded to Tehran Imam Khomeini International Airport (IKA) in Tehran, Iran.

       iii.    On or about May 4, 2015, Eliabachus contacted a second aviation parts company located in Miami, Florida ("ABS") to negotiate the purchase of four additional Brake Assembly Parts.   Ultimately, Eliabachus executed a purchase order with ABS for the purchase of four Brake Assembly Parts for a total cost of $40,000.   On May 6, 2015, and May 13, 2015, two wire transfers in the amounts of $15,000 and $25,000, respectively, were sent from the Edsun Accounts to ABS to complete the transaction.

       iv.    Further, between on or about May 5, 2015, and May 11, 2015, Eliabachus corresponded with an AAS representative via the Edsun E-Mail Account to negotiate the purchase of one Brake Assembly Part at a cost of $8,400.   After agreeing on a purchase price, a wire transfer in the amount of $8,400 was sent from the Edsun Accounts to AAS on May 11, 2015, to complete the transaction.

       v.    Subsequently, between on or about May 18, 2015, and May 19, 2015, Eliabachus used the Edsun E-Mail Account to correspond with a representative from a freight-forwarding company headquartered in East Rockaway, New York ("ITC").   Upon retaining ITC's services, Eliabachus provided the company with a signed and completed SED Form for the export of the five Brake Assembly Parts purchased from AAS and ABS.   Significantly, the SED Form falsely listed Reibel as the ultimate consignee and end-user of the parts.

       vi.    Between on or about May 21, 2015, and May 26, 2015, CC-1 used the CC-1 E-Mail Account to correspond with a Reibel representative in connection with the Brake Assembly Parts shipment.   During those communications, CC-1 was advised that the shipment had been received from the United States and had been trans-shipped from Turkey to IKA in Iran, per CC-1's prior instructions.

       vii.    Law enforcement's review of the Spreadsheet, shipping records, and e-mail communications between CC-1 and Eliabachus confirm that the Brake Assembly Parts were trans-shipped by Reibel in Turkey and were successfully received in Iran on or about May 26, 2015.[8]   The ultimate

---

[8] The documents obtained in connection with this shipment included an air waybill, which identified "Sun Bright Havacilik Ic Ve Dis Tic" ("SunBright Aviation") as the entity requesting delivery of the shipment to Iran. Records lawfully obtained from a U.S.-based internet service provider confirm that CC-1 used the CC-1 E-Mail Account to register an internet domain name for SunBright Aviation in or about 2015, and that

recipient, or end-user, of the Brake Assembly Parts was identified as Iran Air Tours (an established subsidiary of Iran Air), located in Tehran, Iran.

        viii.    A diligent search of relevant BIS and OFAC databases has confirmed that no export license was applied for by, nor granted to, the defendants or any of their related entities in connection with this transaction.

    B.    <u>The Combined Aircraft Parts Transaction</u>

        i.    On or about August 5, 2016, and August 25, 2016, CC-1 used the CC-1 E-Mail Account to direct a suspected member of the Iranian Network to facilitate foreign wire transfers to the Edsun Accounts.   A review of banking records and additional e-mail correspondence from CC-1 have confirmed that the Edsun Accounts subsequently received two wire transfers. The first transfer, in the amount of $20,000, was sent from a Turkish bank account held in Tango's name; the second transfer, in the amount of $16,000, was sent from a Turkish bank account held in Pelikano's name.

        ii.    Subsequently, between September 26, 2016, and on or about November 15, 2016, Eliabachus used the Edsun ID to submit multiple RFQ's on the Marketplace for a variety of aircraft components.   Ultimately, purchase and banking records confirm that Eliabachus facilitated the purchase of various quantities of 23 unique aircraft components from several U.S.-based manufacturers and distributors.   In total, the records indicate that Eliabachus obtained 435 total units at a cost of approximately $16,062 (the "Combined Aircraft Parts").   All of the parts were purchased with credit cards or wire transfers from the Edsun Accounts, and were initially shipped by the various U.S. suppliers to the New Jersey Address.

        iii.    On or about November 21, 2016, Eliabachus used the Edsun E-Mail Account to contact a U.S.-based freight-forwarding company ("AS Transport") in order to facilitate the overseas shipment of the Combined Aircraft Parts.   Eliabachus provided a shipping invoice to AS Transport that falsely indicated the value of the Combined Aircraft Parts was $2,200.55, and that the shipment had been sold to a company identified as "Delta Parts Supply"[9] in the UAE.   Eliabachus further directed the shipment to be sent

_____

CC-1 and Eliabachus have paid yearly domain registration fees since that time.   This is an indication to law enforcement that SunBright Aviation is likely a front company used and controlled by the defendants in connection with the network's illicit export activities.

[9] A review of law enforcement and open source databases indicates that Delta Parts Supply is a Dubai-based company specializing in marine supply and oil and gas technology services.   Upon and information and belief, Delta Parts Supply does not

from the New Jersey Address to a second company identified as "Parthia Cargo" located in Dubai.[10]   AS Transport provided Eliabachus with a tracking number for the shipment, which was executed on or about November 22, 2016.

       iv.     Thereafter, by e-mail from the CC-1 E-Mail Account dated November 23, 2016, CC-1 advised representatives at Parthia Cargo of the pending Combined Aircraft Parts shipment.   CC-1 provided Parthia Cargo with the tracking number of the shipment, along with a copy of the same false shipping invoice that Eliabachus previously supplied to AS Transport.   The following day, a Parthia Cargo employee confirmed receipt of CC-1's e-mail instructions.

       v.     In a series of e-mail correspondence from on or about November 29, 2016, through December 8, 2016, Parthia Cargo confirmed the details of CC-1's requested trans-shipment of the Combined Aircraft Parts to a location in Iran.   A review of shipping records and other documents obtained in this investigation indicate that the Combined Aircraft Parts were ultimately forwarded to a known procurement agent for ATA Airlines.

       vi.     As summarized above, the defendants' intentional devaluation of the Combined Aircraft Parts shipment as being less than $2,500, as well as their false claims of a UAE-based end-user, rather than an Iranian entity, were efforts to evade the necessity of filing an SED Form and to conceal the illicit shipment from law enforcement officials.   Additionally, a search of relevant BIS and OFAC databases has confirmed that no export license was applied for by, nor granted to, the defendants or any of their related entities in connection with this transaction.

       C.     The Rotor Assembly Parts Transaction

       i.     Beginning in or about March 2017, the Edsun ID was used to submit various RFQs on the Marketplace to an aviation supply company located in Gardena, California ("NAS").   The listing was sent on behalf of Edsun Equipments and Eliabachus, and requested quotes for various aircraft parts, including rotor assemblies, cerametallic linings, and plate stators used in connection with commercial aircraft (the "Rotor Assembly Parts").

---

engage in any aircraft related services, and in fact did not receive delivery of the Combined Aircraft Parts in connection with this transaction.   Accordingly, law enforcement has assessed that the defendants used Delta Parts Supply as a front company in connection with its illicit export activities.

[10] A review of law enforcement and open source databases indicates that Parthia Cargo is a Dubai, UAE-based freight-forwarder that specializes in sending shipments to Iran.

       ii.     Subsequently, between on or about March 6, 2017, and on or about July 10, 2017, Eliabachus used the Edsun E-Mail Account to negotiate the purchase of 7 unique aircraft components from NAS.   In total, purchase records indicate that Eliabachus obtained 1,549 total units from NAS at a cost of approximately $77,614.

       iii.     Banking records confirm that on July 6, 2017, the Edsun Accounts received a foreign wire transfer in the amount of $93,000 from a Turkish-based account held in Tango's name.   Thereafter, by e-mail dated July 10, 2017, Eliabachus contacted NAS to advise that Edsun Equipments had sent payment in the amount of $77,614.22 to complete the pending Rotor Assembly Parts transaction.

       iv.     On or about August 3, 2017, Eliabachus used the Edsun E-Mail Account to contact a representative from AS Transport to facilitate the overseas shipment of the Rotor Assembly Parts.   Eliabachus provided a shipping invoice to AS Transport that falsely indicated the value of the Combined Aircraft Parts was $2,101.00, and that the end-user of the shipment was Reibel in Turkey.   The intentional devaluation by Eliabachus of the shipment as being less than $2,500 was designed to evade the necessity of filing an SED Form and to conceal the illicit shipment from law enforcement officials.

       v.     Further, in or about mid-August 2017, BIS agents lawfully obtained a number of documents and correspondence from Reibel.   The documents identified approximately six prior shipments containing license-controlled aircraft components sent on behalf of Edsun Equipment to Reibel from in or about April 2017 through June 2017.   In each instance, Edsun Equipment falsely listed Reibel as the ultimate consignee/end-user of the goods, as Reibel subsequently forwarded those goods to locations and entities in Iran at CC-1's direction.   Additionally, a search of relevant BIS and OFAC databases has confirmed that no export licenses were applied for by, nor granted to, the defendants or any of their related entities in connection with any known shipments to Reibel during the course of this investigation.